**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Elizabeth Reyes Lytikainen, | No. CV-18-04685-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Schaffer's Bridal LLC, et al., | |
| Defendants. | |

Pending before the Court is a motion to dismiss filed by Defendants Schaffer's Bridal, LLC, Susan Hagedorn, and Gary M. Kirke (collectively, "Defendants"). (Doc. 10.)[1] For the following reasons, the motion will be granted in part and denied in part.

## BACKGROUND

The facts pleaded in Plaintiff Elizabeth Reyes Lytikainen's complaint, which the Court accepts as true for the purpose of this motion to dismiss, are as follows:

Defendants Hagedorn and Kirke are members of Schaffer's Bridal, LLC. (Doc. 1-4 ¶¶ 3, 4.) Schaffer's Bridal has two locations: one in Scottsdale, Arizona, and another in Des Moines, Iowa. (*Id.* ¶ 9.)

In 2014, Lytikainen began providing services to Schaffer's Bridal, including performing dress alterations and designing and making bridal veils. (*Id.* ¶ 10.)

---

[1] After setting a hearing on Defendants' motion (Doc. 14), the Court issued a tentative ruling (Doc. 15). After reviewing it, the parties informed the Court that they did not wish to proceed with oral argument and instead stipulated that Lytikainen could file a first amended complaint in conformance with the tentative ruling.

In early 2015, "in response to [Lytikainen's] request for payment of substantial amounts owing to [her]," Hagedorn, on behalf of Defendants, offered to sell Lytikainen a 50% interest in Schaffer's Bridal. (*Id.* ¶ 11.) The offer provided that Defendants would immediately transfer the 50% interest in Schaffer's Bridal in exchange for $100,000 in cash and $400,000 worth of veil and gown alteration services. (*Id.*) The offer also provided that Defendants would compensate Lytikainen $80,000 per year to manage Schaffer's Bridal's Scottsdale location. (*Id.*)

After Lytikainen accepted the offer, Hagedorn promised that Defendants would prepare documentation to reflect Lytikainen's ownership interest in Schaffer's Bridal. (*Id.* ¶ 12.) Shortly thereafter, Lytikainen began managing the Scottsdale location and received the promised salary. (*Id.* ¶ 13.)

In September 2015, the Scottsdale location relocated within Scottsdale. (*Id.* ¶ 14.) Lytikainen continued to manage the Scottsdale location, at Hagedorn's instruction, but no longer received her promised salary. (*Id.*)

In late 2015, Hagedorn assured Lytikainen that she would receive her management salary, payment owing for alterations and veils, and documentation confirming the transfer of her 50% interest in Schaffer's Bridal. (*Id.* ¶ 15.)

In or around December 2015, Kirke and Hagedorn flew Lytikainen to Des Moines, Iowa and promised to finalize the transfer of the 50% interest in Schaffer's Bridal. (*Id.* ¶ 16.) At that meeting, Kirke introduced Lytikainen to others as his business partner and reiterated that the documentation reflecting her 50% interest in Schaffer's Bridal would be prepared. (*Id.* ¶ 17.)

Through the first six months of 2017, Lytikainen continued to manage the Scottsdale location and continued to provide alteration services and veils to Schaffer's Bridal's Scottsdale and Des Moines locations. (*Id.* ¶ 19.) However, in or around July 2017, Lytikainen ceased her involvement with Schaffer's Bridal because Defendants hadn't paid her the promised management salary, or paid her the amounts owed for alterations and veils, or transferred the 50% interest in Schaffer's Bridal. (*Id.* ¶ 20.)

"Throughout 2017 and early 2018," Defendants continued to promise to pay amounts owed to Lytikainen, including unpaid salary. (*Id.* ¶ 36.) In mid-2018, Defendants offered payment to Lytikainen, but it included "little or none of the past due salary owed to [Lytikainen] for managing the Scottsdale Schaffer's store." (*Id.*)

**LEGAL STANDARD**

"[T]o survive a motion to dismiss, a party must allege 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678). "[A]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." *Id.* at 1144-45 (citation omitted). However, the court need not accept legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 679-80. The court also may dismiss due to "a lack of a cognizable legal theory." *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

**ANALYSIS**

I. Securities Claims (Counts I and II)[2]

Defendants move to dismiss Lytikainen's securities claims because: (1) the interest in Schaffer's Bridal on which her securities claims is premised isn't a "security" within the meaning of the Rule 10b-5; (2) Lytikainen doesn't plead a sufficient nexus between the alleged fraud and the sale of a security; and (3) Lytikainen doesn't plead her securities claims with adequate particularity as required by Rule 9(b). (Doc. 10 at 4-10.) The Court agrees with Defendants' first argument and will therefore dismiss Counts I and II.

---

[2] Lytikainen brought securities claims under both federal law (Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5) and state law (A.R.S. § 44-1991). The Court addresses these claims simultaneously under federal law because "the near-identical language of the two statutes is strong support for applying existing federal precedent on Rule 10b-5 to § 44-1991(A)." *In re Allstate Life Ins. Co. Litig.*, 2013 WL 5161688, *13 (D. Ariz. 2013).

Lytikainen alleges the "security" at issue is a 50% stake in Schaffer's Bridal. (Doc. 1-4 ¶¶ 22, 31.) Because Schaffer's Bridal is a limited liability company, Defendants argue, Lytikainen's interest can only be a "security" if it constitutes an "investment contract" under the Securities Exchange Act. (Doc. 10 at 5.) Defendants contend Lytikainen's interest doesn't qualify because an investment contract is an "investment of money in a common scheme or enterprise with the expectation of profits to come *solely* from the efforts of others." (*Id.* at 5-6, emphasis added.) Defendants assert the profits from Schaffer's Bridal don't come solely from the efforts of others—the complaint alleges Lytikainen managed a Schaffer's Bridal location and provided alteration services. (*Id.* at 5.) Defendants thus conclude that, because Lytikainen is an active participant in Schaffer's Bridal, her interest can't constitute an investment contract and isn't a "security." (*Id.*)

"[C]ourts tasked with deciding whether LLC membership interests constitute a security under the Exchange Act generally evaluate whether such interests are 'investment contracts . . . .'" *D.R. Mason Constr. Co. v. GBOD, LLC*, 2018 WL 1306425, *5 (S.D. Cal. 2018). The three requirements for establishing an investment contract are: (1) an investment of money; (2) in a common enterprise; (3) with an expectation of profits to be derived solely from the efforts of others. *Secs. & Exch. Comm'n v. W.J. Howey Co.*, 328 U.S. 293, 298 (1946). Here, the third prong is at issue—whether the expected profits would be derived "solely" from others' efforts.

The Ninth Circuit's seminal case on the meaning of "solely" in this context is *Securities & Exchange Commission v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476 (9th Cir. 1973). There, the court clarified that "the word 'solely' should not be read as a strict or literal limitation" but must be "construed realistically, so as to include within the definition those schemes which involve in substance, if not form, securities." *Id.* at 482. Based on this clarification, the court held that an investment may qualify as an "investment contract" within the Securities Exchange Act if "the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Id.*

Applying this standard, the *Turner* court determined that a pyramid scheme, which required "some effort" from investors, still constituted a security. There, investors purchased the opportunity to help sell self-motivation and sales-ability courses to others. *Id.* at 478. After purchasing the right to help sell these courses, the investor's role was to find other prospective purchasers, "create an illusion of his own affluence," and induce the prospective purchasers to attend a meeting at which there would be a sales pitch by Dare To Be Great ("Dare")—the company that sold the investments. *Id.* at 480. The meetings, which were presented by Dare, focused on convincing prospective purchasers of the wealth that awaited if they purchased the courses. *Id.* at 479. After the meeting, Dare pressured the attendees to make a purchase. *Id.* If a sale was made, an investor would receive a portion of the amount paid by the purchaser(s) he had steered to the meeting. *Id.* at 478. The court reasoned that an investor merely contributed "some effort" toward the ultimate success of this scheme. *Id.* at 482. In contrast, Dare contributed the critical "selling efforts." *Id.* Thus, the court concluded that the essential efforts of Dare, not the investor, "affect[ed] the failure or success of the enterprise." *Id.* at 483. Based on this conclusion, the court held that the pyramid scheme qualified as an "investment contract." *Id.*

The next year, in *Bitter v. Hoby's International, Inc.*, 498 F.2d 183 (9th Cir. 1974), the Ninth Circuit again analyzed whether an investment constituted an "investment contract." There, franchisees purchased restaurant franchises, and each would profit based on the success of his individual franchise. *Id.* at 184-85. The franchisees argued the franchise agreements were investment contracts because they didn't have any practical profit-influencing control due to the imposition of "strict standards for operation, including standards for materials, merchandise, supplies, financial reporting, advertising and employee service, demeanor and appearance, as well as controls over hours of operation, advertisements, the painting of the building and installation of vending machines." *Id.* at 184. The Ninth Circuit rejected this argument, holding that the franchisees' efforts entailed "continuous operation of the restaurant," which included production and sale of food and employment of personnel, among other things. *Id.* at 185. The court concluded such efforts

by the franchisees were "qualitatively more substantial" than those by the investors in *Turner*, and "[i]n spite of regulation, each franchisee's active management was essential to the success of his retail restaurant." *Id.*

Here, the activities performed by Lytikainen more closely resemble the "substantial" activities performed by the franchisees in *Bitter* than the "some effort" performed by the investors in *Turner*. The complaint alleges there are only two Schaffer's Bridal stores—one in Arizona, the other in Iowa. (*Id.* ¶ 9.) Lytikainen alleges she managed one of those stores and provided veil and gown alterations at both stores. (*Id.* ¶ 20.) This profit-generating conduct is like the production and sale of food as in *Bitter* and unlike merely inducing a prospective buyer to attend a sales meeting as in *Turner*. Although Lytikainen's 50% interest would entitle her to share in profits from both the Scottsdale location (which she managed) and the Des Moines location (which she didn't manage)—which is unlike the franchisees in *Bitter,* who derived profit only from their specific restaurant franchises—Lytikainen's management of the Scottsdale location was still critical to the success of the overall enterprise. As the manager of one half of Schaffer's Bridal's locations and the key provider of both locations' alterations, the failure or success of the entire enterprise depended in large part on Lytikainen's efforts. Thus, under the facts alleged in the complaint, she was providing "substantial" and "essential" efforts—efforts that are inconsistent with an "investment contract."

Lytikainen cites an Arizona Court of Appeals case, *Nutek Information Systems, Inc. v. Arizona Corporation Commission*, 977 P.2d 826 (Ariz. Ct. App. 1998), for the proposition that her interest in Schaffer's Bridal constitutes a security because, despite her efforts managing the Scottsdale location and providing veil and gown alterations, she hasn't alleged she actually "had . . . control over the LLC itself." (Doc. 12 at 8-9.) This misconstrues *Nutek*'s holding. The investors in *Nutek* invested in "units" of LLCs that were managed by others. *Id.* at 828. The investors didn't personally operate the LLCs. *Id.* at 828-29. Although the investors had the ability to "approve the management efforts of a third party," the court observed that "the large number (920) of geographically dispersed

investors . . . prevented the members from exercising effective control of the business." *Id.* at 832. Thus, the *Nutek* court concluded the investors were "no different than shareholders." *Id.* Lytikainen stands in far different shoes here.[3]

II. <u>Statute of Limitations (Counts III-XII)</u>

A. **The Parties' Arguments**

Defendants move to dismiss Counts III-XII because (1) each is premised on the breach of an employment contract, and thus subject to a one-year statute of limitations under Arizona law, and (2) Lytikainen's complaint demonstrates her claims accrued no later than July 2017, so the filing of her complaint in November 2018 was untimely. (Doc. 10 at 10-11.)

In response, Lytikainen contends that only Count III is premised on an employment contract and the remaining counts "would not be materially affected if the employment agreement were eliminated." (Doc. 12 at 12-13.) And as to Count III, Lytikainen disputes it accrued in July 2017—she contends the complaint shows she "reasonably believed until early 2018 that Defendants would honor the employment agreement." (*Id.* at 13-14.)

B. **Which Counts Arise From The Breach Of An "Employment Contract"?**

A.R.S. § 12-541(3) provides a one-year statute of limitations for "breach of an oral

---

[3] Although the Court agrees with Defendants that Counts I and II must be dismissed because there is no underlying security on which to premise a securities fraud claim, the Court disagrees with Defendants' alternative dismissal theory (*i.e.,* there is an insufficient nexus between the alleged fraud and the sale of a security). In support of this argument, Defendants cite *Hunt v. Robinson*, 852 F.2d 786, 787 (4th Cir. 1988), which rejected the plaintiff's claim "that the defendants fraudulently refused to convey or tender the stock to him . . . as required by the terms of [a] contract" because the plaintiff didn't point to "misrepresentations concerning the financial resources or assets of the . . . company" and, thus, the misrepresentation wasn't about "the value of the stock." Defendants' reliance on *Hunt* is misplaced because the Supreme Court, in *Securities & Exchange Commission v. Zandford*, 535 U.S. 813 (2002), subsequently rejected the notion that a misrepresentation must relate to the value of a security to fall within the ambit of the Securities Exchange Act: "[T]his Court has [n]ever held that there must be a misrepresentation about the value of a particular security in order to run afoul of the Act." *Id.* at 820. The *Zandford* Court also approvingly cited (1) a prior SEC decision holding "that a broker who accepts payment for securities that he never intends to deliver . . . violates § 10(b) and Rule 10b-5" and (2) a prior Supreme Court decision holding that a defendant violated the Securities Exchange Act by selling "a security (the option) while secretly intending from the very beginning not to honor the option." *Id.* at 819-20, 823-24 (citations omitted). That is what Lytikainen alleges here—Defendants promised to transfer a 50% interest in Schaffer's Bridal to her but never intended to honor that promise.

or written employment contract including contract actions based on employee handbooks or policy manuals that do not specify a time period in which to bring an action." A.R.S. § 12-541(3). Although the statute doesn't provide a definition of the term "employment contract," the Arizona Court of Appeals has instructed courts to give that term its ordinary meaning: a "contract between an employer and employee in which the terms and conditions of employment are stated." *Redhair v. Kinerk, Beal, Schmidt, Dyer & Sethi, P.C.*, 183 P.3d 544, 546 (Ariz. Ct. App. 2008) (citation omitted). Additionally, the *Redhair* court explained that employment contracts include "all contracts defining specific responsibilities of the employer to the employee," meaning any agreement related to "the nature, conditions, or duration" of employment. *Id.* at 548-49.

Given this backdrop, it is necessary to begin by identifying which counts in the complaint can be said to arise from an "employment contract." As for Count III, Lytikainen concedes it involves an alleged breach of an employment contract. (Doc. 12 at 13 [agreeing that one-year statute of limitations applies to Count III, which refers to Defendants' failure to pay "past due salary owed to Plaintiff for managing the Scottsdale Schaffer's store"].)

As for Count IV ("Breach of Contract") and Count V ("Breach of Covenant of Good Faith and Fair Dealing"), the complaint asserts that each arises from the breach of an oral contract that is characterized in the complaint as "the Agreement." The Agreement provided that, in exchange for a 50% interest in Schaffer's Bridal, Lytikainen would pay $100,000 in cash and provide $400,000 in veil and gown alteration services. (Doc. 1-4 ¶ 11.) Additionally, in exchange for $80,000 per year, Lytikainen would manage the Scottsdale location. (*Id.*)

Although Defendants argue the Agreement must be characterized as an "employment contract" for purposes of A.R.S. § 12-541(3) because one of its terms related to Lytikainen's annual salary for managing the Scottsdale location, the Court does not share this view. Instead, the Court interprets the Agreement as having two distinct components. The first, the purchase of a 50% interest in Schaffer's Bridal in exchange for $100,000 in cash and $400,000 of alteration services, shouldn't be construed as an "employment

contract." Although a large part of Lytikainen's obligation involved her labor, an exchange of labor for consideration doesn't necessarily mean there is an "employment contract"—depending on the circumstances, such an arrangement can give rise to an independent contractor relationship. A.R.S. § 23-902(C). That is exactly what Lytikainen contends was present here: "[T]he vast majority of [her] business relationship with Schaffer's was as an independent contractor doing dress alteration and providing bridal veils." (Doc. 12 at 2.) (*See also* Doc. 1-4 ¶ 11 ["Plaintiff continued to provide veils and gown alterations to Schaffer's Scottsdale and Des Moines stores as an independent contractor."].)[4]

Common sense supports the application of this bifurcated approach. If, for example, Lytikainen and Defendants signed a single piece of paper under which (1) Lytikainen agreed to manage the Scottsdale location for $80,000 per year and (2) Defendants agreed to trade a particular vehicle to Lytikainen in return for a valuable heirloom, it wouldn't make sense to apply the one-year statute of limitations for employment contracts to the unrelated vehicle-for-heirloom swap. Thus, the Court won't apply a one-year statute of limitations to Counts IV and V to the extent those counts seek recovery related to Lytikainen's purchase of the 50% interest in Schaffer's Bridal and/or related to Defendants' alleged failure to pay Lytikainen for the alteration services she was providing on an independent contractor basis.[5]

The next group of counts that Defendants seek to dismiss on statute-of-limitations grounds are Count VI ("Fraud"), Count VII ("Conspiracy to Defraud"), and Count VIII

---

[4] Although Defendants cite a case in which a court applied A.R.S. § 12-541(3)'s one-year statute of limitations to an employee stock agreement, that case is inapposite. In *Day v. LSI Corporation*, 174 F. Supp. 3d 1130 (D. Ariz. 2016), the stock agreement was part of a specific "plan" adopted by the employer to compensate its employees. *Id.* at 1142. Here, Lytikainen alleges she entered into a contract to purchase a stock interest in return for cash and certain independent-contractor services.

[5] Counts IV and V each seek recovery based upon Defendants (1) "[n]ot transferring the 50% interest in Shaffer's," (2) "[n]ot paying all of the management salary due Plaintiff," and (3) "[n]ot paying for all of the veils and gown alterations that Plaintiff provided to Shaffer's Scottsdale and Des Moines stores." (Doc. 1-4 at 8.) In the Court's view, the second of these claims is subject to a one-year statute of limitations, because it is premised upon a breach of the portion of the "Agreement" that can be characterized as an employment contract, but the first and third are not subject to a one-year statute of limitations because they aren't premised on the breach of an employment contract.

- 9 -

("Aiding and Abetting Fraud"). Even though one of the categories of damages sought in those counts is the annual salary that Lytikainen should have been paid for managing the Scottsdale location—a theory of recovery that seems like a breach-of-an-employment-contract theory—the Court will decline to apply a one-year statute of limitations to them because the complaint characterizes them as fraud claims, which have a three-year statute of limitations under Arizona law. *Woodward v. Chirco Constr. Co.*, 687 P.2d 1275, 1279 (Ariz. Ct. App. 1984) ("The defense of the statute of limitations is not favored by the courts, and where two constructions are possible, the longer period of limitations is preferred.") (citations omitted).

As for the three counts in the complaint that are premised on the breach of an alleged fiduciary duty—Count IX ("Breach of Fiduciary Duty"), Count X ("Aiding and Abetting Breach of Fiduciary Duty"), and Count XII ("Accounting")—the Court need not decide what statute of limitations applies because those counts will be dismissed for other reasons. *See* Part IV *infra*.

Finally, as for Count XI ("Unjust Enrichment"), the Court declines to dismiss this claim on statute-of-limitations grounds because it is not an independent theory of liability and simply represents an alternative remedy.

### C. Are The Claims Premised On An Employment Contract Time-Barred?

For the reasons stated above, the Court construes Count III, as well as portions of Counts IV and V, as subject to a one-year statute of limitations under A.R.S. § 12-541(3). The remaining question is when that one-year statute of limitations began running. In Arizona, courts apply the "discovery rule" to determine when a breach-of-contract claim accrues, *Gust, Rosenfeld & Henderson v. Prudential Ins. Co. of Am.*, 898 P.2d 964, 967-68 (Ariz. 1995), so "a cause of action does not accrue until the plaintiff knows or with reasonable diligence should know the facts underlying the cause," *Doe v. Roe*, 955 P.2d 951, 960 (Ariz. 1998).

The facts as pleaded demonstrate that Lytikainen knew the breach occurred by no later than July 2017. Lytikainen alleges that, despite repeated requests by her, "no

management salary was paid, only a small portion of the amounts owing for alterations and veils, [and] no transfer of any ownership interest to Plaintiff occurred. Therefore, in or about July 2017, Plaintiff stopped managing Schaffer's Scottsdale store and stopped providing gown services and veils to Schaffer's Scottsdale and Des Moines store." (Doc. 1-4 ¶ 20.) In other words, Lytikainen severed her professional relationship with Defendants in July 2017 because they had breached her employment contract by not paying her salary.

Lytikainen argues she "reasonably believed until early 2018 that Defendants would honor the employment agreement." (Doc. 12 at 14.) In support of this argument, Lytikainen cites paragraph 36 of the complaint, which states:

> Throughout 2017 and early 2018, Hagedorn, on behalf of herself, Kirke and Schaffer's, promised to make arrangements to reconcile and pay amounts owed to Plaintiff including the unpaid salary. However, in mid-2018, a few months before the this Complaint, Defendants provided the promised reconciliation and offer of payment, but such reconciliation and offered payment included little or none of the past due salary owed to Plaintiff for managing the Scottsdale Schaffer's store.

(Doc. 1-4 ¶ 36.)

This allegation doesn't alter whether Lytikainen knew, or should have known, "the facts underlying the cause" in July 2017. *Doe*, 955 P.2d at 960. After all, Lytikainen acknowledges Defendants didn't perform their obligations under the employment contract and that she terminated her relationship with them in July 2017 based on that non-performance. (Doc. 1-4 ¶ 20.) Whether Defendants subsequently promised to remedy their breach has no bearing on whether Lytikainen knew that facts giving rise to her claim. *Cf. Hall v. Romero*, 685 P.2d 757, 763 (Ariz. Ct. App. 1984) (holding that claim accrued by November 1974, even though the breaching party had "promised to perform in the future," because such future promises "did not eradicate the fact that . . . [the breaching party] had already broken its promise to perform"). Thus, the Court dismisses Count III in its entirety and Counts IV and V to the extent those claims seek to recover past-due wages.[6]

---

[6] To the extent Lytikainen argues Defendants' promise to remedy the breach tolls the statute of limitations, this argument fails, too. When an action is barred by the statute of limitations, an "acknowledgment of the justness of the claim" is only valid if "the acknowledgment is in writing and signed by the party to be charged thereby." A.R.S. §

III.     Fraud-Based Claims (Counts VI-VIII)

Defendants argue Lytikainen doesn't satisfy Rule 9(b)'s standards for alleging fraud in Counts VI, VII, and VIII. Specifically, Defendants contend Lytikainen doesn't: (1) delineate each alleged false statement; (2) plead why each statement was false; (3) plead how they allegedly communicated the false statements; and (4) plead facts supporting her conclusory statement that Defendants engaged in a conspiratorial scheme and aided and abetted each other's fraud. (Doc. 10 at 14.)

Claims that are "grounded in fraud" or "sound in fraud" are subject to Rule 9(b)'s heightened pleading standards. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103-04 (9th Cir. 2003). "Rule 9(b) demands that, when averments of fraud are made, the circumstances constituting the alleged fraud [must] be specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong." *Id.* at 1106 (internal quotation marks and citation omitted). This requires a plaintiff to plead "the who, what, when, where, and how of the misconduct charged," and "set forth what is false or misleading about a statement, and why it is false." *Id.* (internal quotation marks and citation omitted).

Whether Lytikainen satisfies 9(b)'s heightened pleading standard is a close call. On the one hand, the complaint alleges with particularity at least three instances in which allegedly fraudulent representations were made to Lytikainen. First, the complaint alleges Hagedorn (who) agreed to pay her $80,000 per year to manage the Scottsdale location and to transfer a 50% interest to her in exchange for $500,0000 (what). (Doc. 1-4 ¶ 11.) Hagedorn made this representation in "early 2015" (when) in Scottsdale, Arizona (where). (*Id.* ¶¶ 11, 48.)   Second, the complaint alleges Hagedorn (who) "confirm[ed] the agreement" and "assur[ed] [Lytikainen] that the transfer would soon be finalized" (what). (*Id.* ¶ 15.)  This occurred in "late 2015" (when) in Scottsdale, Arizona (where). (*Id.* ¶¶ 15, 48.)  Third, the complaint alleges Kirke (who) "assured [Lytikainen] that the necessary documentation would be prepared and the promised 50% interest in Schaffer's would be

---

12-508.  Lytikainen makes no allegations to this effect.

- 12 -

transferred to [her]" (what). (*Id.* ¶ 17.) Kirke made this representation in December 2015 (when) at a meeting in Des Moines, Iowa (where). (*Id.* ¶¶ 16, 17.) The complaint alleges each representation was false because Defendants never paid her management salary or transferred the interest in Schaffer's Bridal. (*Id.* ¶ 20.)

On the other hand, the complaint doesn't expressly allege *how* these representations were made. Although Rule 9(b) requires particular allegations concerning the "how" of the fraud, the contextual details supplied by the complaint make clear that the representations were made orally. Furthermore, in her opposition to Defendants' motion to dismiss, Lytikainen confirmed that "[t]he misrepresentations were made orally directly to Plaintiff." (Doc. 12 at 11.) Although Defendants are, of course, correct in their assertion that whether Lytikainen "has stated a claim depends only on what is in her complaint" (Doc. 13 at 10), it would elevate form over substance to require Lytikainen to file an amended complaint for the sole purpose of making explicit what is already clear from context. It would, for example, be implausible to read the complaint as alleging that, after Defendants flew Lytikainen to Iowa in December 2015 so she could attend a meeting (Doc. 1-4 ¶¶ 16-17), the false representations that Kirke allegedly made to her during that meeting were delivered in inscribed written tablets rather than orally.

IV. <u>Fiduciary Duty Claims (Counts IX, X, And XII)</u>

Defendants argue that Counts IX, X, and XII, all of which are premised on the breach of a fiduciary duty, must be dismissed because the alleged bases for that duty specified in the complaint—"a trusting long-term business relationship" and "friendship"—don't establish a fiduciary relationship. (Doc. 10 at 16-17.)

In response, Lytikainen contends dismissal based on the lack of a fiduciary relationship is premature because the Court must first engage in a factual inquiry to determine whether such a relationship existed. (Doc. 12 at 14-15.)

The Court disagrees that it must engage in a factual inquiry before determining whether a fiduciary duty exists. Although, under Arizona law, "[w]hether a fiduciary relationship exists is generally a question of fact," *Cook v. Orkin Exterminating Co.*, 258

P.3d 149, 151-52 (Ariz. Ct. App. 2011), a plaintiff still must satisfy federal pleading standards, *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) ("It is well-settled that the Federal Rules of Civil Procedure apply in federal court, . . . 'irrespective of whether the substantive law at issue is state or federal.'") (citation omitted). That is, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. And conclusory allegations—such as "a fiduciary duty exists"— are "not entitled to be assumed true." *Id.* at 681. *See also Cruz v. United States*, 219 F. Supp. 2d 1027, 1039 (N.D. Cal. 2002) ("[P]laintiffs have not pled facts that would give rise to a fiduciary relationship, and the Court need not accept their conclusory allegation that such a relationship existed.") .

Lytikainen's allegation that she had a "trusting long-term business relationship" and "friendship" with Defendants isn't enough to plausibly state that Defendants owed her a fiduciary duty. "A fiduciary relationship is a confidential relationship whose attributes include 'great intimacy, disclosure of secrets, [or] intrusting of power.'" *Standard Chartered PLC v. Price Waterhouse*, 945 P.2d 317, 335 (Ariz. Ct. App. 1996). A fiduciary relationship arises when one places "peculiar reliance in the trustworthiness of another." *Stewart v. Phoenix Nat'l Bank*, 64 P.2d 101, 106 (Ariz. 1937). "Mere trust in another's competence or integrity" isn't enough. *Standard Chartered*, 945 P.2d at 335. Lytikainen doesn't allege any facts from which the Court can infer that her relationship with Defendants is anything other than an "arm's length relationship," *id.*, albeit a long-term relationship in which there was trust between friends. For this reason, the Court dismisses Counts IX, X, and XII—those premised on the existence of a fiduciary duty.

V.     Leave To Amend

In their motion, Defendants asked the Court to deny Lytikainen leave to amend her complaint. (Doc. 10 at 17-18.) In her response, Lytikainen stated that "[i]n the event that this Court finds that any allegation of the Complaint is improperly ple[d], . . . Plaintiff respectfully requests leave to further amend the Complaint." (Doc. 12 at 15-16.)

"Rule 15 advises the court that 'leave [to amend] shall be freely given when justice

so requires.'" *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003). "This policy is 'to be applied with extreme liberality.'" *Id.* Thus, the Court shouldn't deny leave to amend unless "the amendment: (1) prejudices the opposing party; (2) is sought in bad faith; (3) produces an undue delay in litigation; or (4) is futile." *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006).

Defendants do not argue that any of those circumstances are present here. Thus, to the extent Lytikainen wishes to attempt to revive some or all of the claims being dismissed in this order—Counts I and II (the securities fraud counts), Count III (the employment contract count), Counts IX, X, and XII (the fiduciary duty counts), or the portions of Counts IV and V premised on the employment contract—she is granted leave to attempt to do so. (Furthermore, during the hearing on August 19, 2019, the parties confirmed that they have stipulated that Lytikainen may file a first amended complaint ("FAC").)

***

Accordingly, **IT IS ORDERED** that:

(1) Defendants' motion to dismiss (Doc. 10) is **granted in part and denied in part**; and

(2) Per the parties' stipulation, Lytikainen may file a FAC in conformance with this ruling and making no further additions. Any such FAC must be filed by September 2, 2019.

Dated this 19th day of August, 2019.

_____
Dominic W. Lanza
United States District Judge